**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| MYKLE JACOBS, individually and on behalf of all other similarly situated individuals,<br><br>             Plaintiff,<br><br>  vs.<br><br>ERNST & YOUNG INVESTMENT ADVISERS LLP and BANK OF AMERICA CORPORATION,<br><br>             Defendants. | CASE NO. _____ |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiff Mykle Jacobs ("Plaintiff") individually and on behalf of all others similarly situated (the "Class" or "Class Members"), brings this class action lawsuit against Defendants Ernst & Young Investment Advisers LLP ("EY") and Bank of America Corporation ("BOA" or "Bank of America") (collectively, "Defendants"). The following allegations are based on Plaintiff's knowledge, investigations of counsel, facts of public record, and upon information and belief.

### I.     <u>INTRODUCTION</u>

1.      Plaintiff brings this class action lawsuit against Defendants for their failure to protect Plaintiff's and the Class's highly sensitive Personally Identifiable Information ("PII"), including their names or first initials, and last names, addresses, financial account information, debit or credit card numbers, Social Security numbers, and/or or unique government issued

1

identification numbers. As a result, well-known cybergang, Cl0p ("Clop"), easily accessed EY's servers, **stealing** the PII of Plaintiff and the Class from May 28, 2023 through May 31, 2023 (the "Data Breach" or "Breach"). Now, Plaintiff's and the Class's confidential PII is in the hands of cybercriminals **who have already posted it online for public viewing**.[1]

2.    EY provides consulting, advisory, and tax services to Bank of America. As a part of those services, EY receives and handles PII, including that of Plaintiff and the Class.

3.    Plaintiff and the Class provided their PII to Bank of America to receive financial services with the understanding that Bank of America would not provide their PII to third parties with inadequate data security. However, this turned out to be wrong.

4.    On May 31, 2023, EY learned that the file transfer application it used, and failed to adequately secure, MOVEit, was infiltrated by cybercriminals.[2]

5.    The perpetrator of the Breach was Russian cybergang, Clop.

6.    After the Breach, EY initiated an investigation and determined that the sensitive PII of Plaintiff and the Class, **approximately 30,210 individuals**, was compromised during the Data Breach.[3]

7.    Regrettably, Clop has already exploited the PII stolen in the Data Breach.[4]

---

[1]    *See*    https://www.bleepingcomputer.com/news/security/clop-now-leaks-data-stolen-in-moveit-attacks-on-clearweb-sites/;    *see also*    https://cybernews.com/news/ey-bank-of-america-data-breach/.

[2] *See* Exhibit 1 (Notice Letter)

[3]    *See*    https://apps.web.maine.gov/online/aeviewer/ME/40/c43aee1c-dbc4-4a6d-b0d1-147ad3b23c37.shtml.

[4] *See* https://cybernews.com/security/clop-victims-pwc-ernst-young-sony-moveit-hack/.





8.      Clop posted data obtained in the Breach on the clearweb and the dark web.[5]
Thus, Plaintiff's and the Class's PII was not only stolen, but  published and exploited.

9.      None of this should have happened because the Data Breach was entirely
preventable.

---

[5] *See id.*

10.     Indeed, MOVEit users, such as EY, are each ***separately responsible*** for deciding what kinds of files to transfer using MOVEit, and for configuring the application to operate in a secure manner in their independent environments.

11.     However, EY utterly failed to configure the application to operate in a secure manner in its independent environment and did not use caution when choosing what files to transfer and store via MOVEit.

12.     Moreover, BOA utterly failed to ensure all third parties it selected and handed over Plaintiff's and the Class's PII to, such as EY, employed adequate data security.

13.     On or around August 22, 2023, 2023, EY sent a letter titled "Notice of Data Breach" ("Notice Letter") to those impacted by the Data Breach, informing them that their PII was compromised in the Data Breach and was now at risk of misuse.[6]

14.     EY conveniently failed to disclose Plaintiff's and the Class's information was obtained by Clop and had already been publicly disclosed.[7]

15.     The Private Information compromised in the Data Breach included ***highly sensitive*** data that represents a gold mine for data thieves. Armed with the Private Information accessed in the Data Breach, data thieves can immediately commit a variety of sordid crimes including, *e.g.*, opening new financial accounts in Class Members' names, making fraudulent transactions, taking out loans in Class Members' names, using Class Members' names to obtain medical services, using Class Members' information to obtain government benefits,

---

[6] *See* Exhibit 1.

[7] https://cybernews.com/security/clop-victims-pwc-ernst-young-sony-moveit-hack/.

filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

16.    Defendants willingly accepted the responsibility to adequately secure, safeguard, protect, and store the PII of Plaintiff and the Class.

17.    There has been no assurance offered by EY that EY has adequately enhanced its data security practices within its own environment sufficiently to avoid a similar data breach in the future.

18.    Similarly, EY has not stated it will terminate its use of the MOVEit software.

19.    BOA has provided no assurances it will terminate its relationship with EY.

20.    Therefore, Plaintiff and Class Members have suffered and are at an imminent, immediate, and continuing increased risk of suffering ascertainable losses in the form of harm from identity theft and other fraudulent misuse of their Private Information, out-of-pocket expenses incurred to remedy or mitigate the effects of the Data Breach, and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach.

21.    The improper access and theft of Plaintiff's and Class Members' Private Information was a known risk to Defendants.

22.    Specifically, EY knew that if it did not individually implement appropriate security measures with its use of the MOVEit software, that a data breach would occur and Plaintiff's and the Class's PII would be unlawfully exposed and at risk.

23.    BOA also knew that if it did not select a third-party with adequate data security that Plaintiff's and the Class PII was at risk of unlawful exposure, including a data breach.

24.    Upon information and belief, EY failed to properly monitor its networks and systems, failed to properly implement adequate data security practices, procedures, infrastructure, and protocols, and failed to encrypt data.

25.    Had EY properly monitored and secured its computer digital environment, the Data Breach would not have happened.

26.    Had BOA inquired about EY's data security, it could have prevented the unlawful exposure of Plaintiff's and the Class's PII in the Data Breach.

27.    Plaintiff's and Class Members' identities are now at risk because of Defendants' negligent conduct as the Private Information that Defendants collected and maintained is now in the hands of data thieves and other unauthorized third parties.

28.    There is no question that cybercriminals stole Plaintiff's and the Class's PII and Plaintiffs' have a lifetime risk of identity theft and fraud ahead of them.

## II.    PARTIES

29.    Plaintiff **Mykle Jacobs** is, and at all times mentioned herein was, an individual citizen of Georgia. Plaintiff received a Notice Letter from Defendants on or around August 22, 2023, advising him that his name or first initial and last name, address, financial account information, debit or credit card numbers, Social Security number, and/or unique government issued identification numbers were compromised.[8]

30.    Defendant **Ernst & Young LLP** is a Delaware limited liability partnership with its principal place of business located at One Manhattan West, New York, New York,

---

[8] *See* Exhibit 1.

10001-8604. Defendants' registered agent, National Registered Agents, Inc., is located at 28 Liberty Street, New York, NY 10005.

31.    Defendant **Bank of America Corporation** is a Delaware corporation with its principal place of business located at 100 North Tryon Street, Charlette, NC 28255. Bank of America conducts substantial business in this District.

32.    Class Members are domiciled across the United States.[9]

### III.    <u>JURISDICTION AND VENUE</u>

33.    This Court has diversity jurisdiction over this action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d) because this is a class action involving more than 100 class members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least some members of the Class are citizens of states that differ from Defendants.

34.    This Court has personal jurisdiction over Defendants because Defendants conduct a substantial amount of business in this District.

35.    Venue is likewise proper as to Defendants in this District under 28 U.S.C. § 1391(a)(1) because EY's principal place of business is in this District and many of Defendants' acts complained of herein occurred within this District.

---

[9]    *See*    https://www.mass.gov/doc/assigned-data-breach-number-30233-ernst-young-llp/download (Notice of Data Breach letter submitted to Attorney General of Massachusetts); https://apps.web.maine.gov/online/aeviewer/ME/40/c43aee1c-dbc4-4a6d-b0d1-147ad3b23c37.shtml (Notice of Data Breach letter submitted to Maine Attorney General's Office); https://oag.ca.gov/ecrime/databreach/reports/sb24-571532 (Notice of Data Breach submitted to the Attorney General of California).

## IV.    **FACTUAL ALLEGATIONS**

**A. *Defendants and the Collection of Plaintiff's and Class Members' Private Information.***

36.    EY is one of the Big Four accounting firms, offering primarily assurance, tax, consulting and advisory services to its clients. [10]

37.    EY employs more than 297,000 people and generates approximately $45 billion in annual revenue. [11]

38.    EY provides consulting, advisory, and tax services to Bank of America. As part of those services, EY receives, stores, and transfers the PII of Plaintiff and the Class.

39.    BOA failed to ensure EY implemented appropriate data security sufficient to protect the PII of Plaintiff and the Class prior to entrusting it with Plaintiff's and the Class's PII.

40.    EY used the MOVEit application to store and/or transfer Plaintiff's and the Class's PII, but took no precautions to secure or monitor its data environment.

41.    Because of the highly sensitive and personal nature of the information Defendants acquired and store, Defendants promised to, among other things: keep Plaintiff's and the Class's PII private; comply with industry standards related to data security; only use and release highly sensitive information stored for reasons that relate to the services they

---

[10]    *See*    https://www.jdsupra.com/legalnews/u-s-division-of-ernst-young-experiences-8946212/.

[11] *See id.*

provide; and/or provide adequate notice to individuals if their Private Information is disclosed without authorization.

42.    By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that they were each individually responsible for protecting Plaintiff's and Class Members' Private Information.

43.    Plaintiff and Class Members relied on Defendants to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this information, which Defendants ultimately failed to do.

**B.    *The Data Breach and the Inadequate Notice to Plaintiff and Class Members***

44.    On May 31, 2023, EY learned that that the file transfer application it used, and failed to secure, MOVEit, was infiltrated by cybercriminals in a massive and preventable data breach.[12]

45.    The Data Breach was perpetrated by the notorious cybergang, Clop, between May 28, 2023, through May 31, 2023.

46.    During the Data Breach, cybercriminals *accessed and stole* Plaintiff's and the Class's PII.

47.    Clop took responsibility for the Data Breach on its dark web blog and posted some of the information stolen in the Breach for easily accessible download:[13]

[IMAGE ON NEXT PAGE]

---

[12] *See* Exhibit 1.

[13] *See* https://cybernews.com/news/ey-bank-of-america-data-breach/.



This is a small piece of information from 3 TB.

Various financial reports and accounting documents in the client folders. Passport scan. Visa scan. Risk and asset management documents.

Contracts and agreements. Credit agreements. Audit reports. Account balances.

**FILES PART1**

DOWNLOAD1
DOWNLOAD2
DOWNLOAD3
DOWNLOAD4
DOWNLOAD5
DOWNLOAD6
DOWNLOAD7
DOWNLOAD8
DOWNLOAD9
DOWNLOAD10
DOWNLOAD11
DOWNLOAD12
DOWNLOAD13

EY posted on Cl0p's dark web blog. Image by Cybernews.

48.     Clop claims to have stolen a massive amount of data during the Data Breach—

3 TB.[14]

49.     In addition to releasing some of the PII obtained in the Data Breach on the

dark web, Clop also created a clearweb website to leak the stolen data, which was hosted

directly on the internet and available to anyone with internet access.[15]

50.     Thus, Clop accessed and stole a cache of highly valuable Private Information

during the Data Breach.

51.     Despite learning of the Data Breach on May 31, 2023, EY did not begin

notifying Data Breach victims that their PII had been exposed until on or around August 22,

---

[14] https://cybernews.com/news/ey-bank-of-america-data-breach/.

[15] https://www.bleepingcomputer.com/news/security/clop-now-leaks-data-stolen-in-moveit-attacks-on-clearweb-sites/; https://www.prlog.org/12975446-hackers-leak-over-3-tb-of-data-of-417-organizations-including-pwc-and-ey.html.

2023 (the date of the Notice Letter).[16] Thus, criminals were given an extensive head start in misusing Plaintiff's and the Class's information.

52.    Defendants had obligations created by contract, industry standards, common law, and representations made to Plaintiff and Class Members to keep Plaintiff's and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

53.    Plaintiff and Class Members provided their Private Information with the reasonable expectation and mutual understanding that Defendants would comply with its obligations to keep such Information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

54.    Plaintiff and the Class also provided their PII with the reasonable expectation and mutual understanding that Defendants would take appropriate measures to ensure the applications it used, such as MOVEit, were secure.

55.    Defendants' data security obligations were particularly important given the substantial increase in cyberattacks in recent years, including recent similar attacks against secure file transfer companies like Accellion and Fortra carried out by the same Russian cybergang, Clop.[17]

56.    Thus, Defendants knew or should have known that their electronic records would be targeted by cybercriminals.

---

[16] *See* Exhibit 1.

[17]    *See*   https://www.bleepingcomputer.com/news/security/global-accellion-data-breaches-linked-to-clop-ransomware-   gang/;   *see   also*   https://www.bleepingcomputer.com/news/security/fortra-shares-findings-on-goanywhere-mft-zero-day-attacks/.

**C. *EY and BOA Have Independent Responsibility for the Data Breach and Could Have Prevented the Data Breach.***

57.     EY was independently responsible for securing its installation of the MOVEit transfer software and could have prevented the Data Breach if it had taken this responsibility seriously.

58.     Ey has a network infrastructure specific to its organization and had the sole responsibility of designing and developing its security network.

59.     It is up to EY to employ software and practices to control and monitor access to its data and systems.

60.     EY was separately responsible for deciding what kinds of files to transfer using MOVEit and configuring the product to operate in a secure manner in its environments.

61.     In sum, EY had the sole responsibility to determine:

a) How to protect and configure the environments in which MOVEit was operating;

b) What kind of data was transferred and stored via MOVEit;

c) Whether and how to encrypt that data; and

d) Whether to monitor or respond to early indicators that hackers were taking steps to access and exfiltrate that data.

62.     The creator of MOVEit (Progress Software Corporation ("PSC")) acknowledges as much and publishes detailed recommendations for users, such as EY, regarding the configuration of the MOVEit software:

> Updates, settings, accounts, and policies should be reviewed on a regular cadence to ensure the configuration is meeting current compliance frameworks and to review for unexpected activity or behavior that needs to be addressed. It is recommended that

> MOVEit administrators perform a regular security audit with their corporate security and compliance teams. Many teams perform this monthly or quarterly. This document is intended to provide MOVEit administrators with a starting point to create their own security checklist that can be used for regular reviews. The list is not exhaustive and not all recommendations will apply to all MOVEit installations.[18]

63. PSC gives a detailed installation and configuration manual so that MOVEit users are in control of the security features offered in the software. EY disregarded these directives and failed to employ any security features in the software.

64. PSC also provides an administrator guide and a security best practices guide to aid in configuring and securing the MOVEit Transfer application. However, EY disregarded these directives.

65. MOVEit is also dependent on other software such as Windows Server, Microsoft SQL Server (MSSQL) or MySQL, and IIS, which EY failed to secure.

66. Additionally, other software and hardware solutions are involved such as routers, firewalls, and mail servers which could have provided access to the MOVEit server to those who should not have it like Clop. Those other software solutions and systems are not produced or maintained by PSC and are not the responsibility of PSC to secure. It is the responsibility of EY, which it failed to do.

67. The data is hosted, maintained, and secured by EY, not PSC.

68. EY was responsible for securing its installation of the MOVEit Transfer software and designing and securing the network infrastructure. However, EY utterly failed to do so.

---

[18] https://community.progress.com/s/article/MOVEit-Security-Best-Practices-Guide.

69.     This is evidenced by the fact that not all MOVEit users were impacted.

70.     Indeed, some MOVEit users had appropriate monitoring and other security measures in place and, as a result, were able to detect and thwart efforts to exploit the MOVEit vulnerability on their systems.

71.     For instance, on May 27, 2023, Akamai, a managed detection and response service that corporations can hire to monitor their data systems, detected the attack and prevented it. "Akamai researchers detected exploitation attempts against one of Akamai's financial customers — an attack that was blocked by the Akamai Adaptive Security Engine."[19]

72.     For this particular vulnerability with the MOVEit application, EY exercising some basic security practices would have mitigated the vulnerability, to gain access, which would have prevented the Breach.

73.     Clop used the ATT&CK Techniques for Enterprise.

74.     Clop simply exploited a weakness in MOVEit to write a file to the web server which was a Remote Access Tool.

75.     Security measures to prevent unauthenticated users from Russian IP addresses accessing the server would have stopped the Breach in its tracks. However, EY did not have these security measures in place.

76.     A deny all default approach to security would have prevented the Breach. However, EY did not have this in place.

---

[19]    *See*   https://www.akamai.com/blog/security-research/moveit-sqli-zero-day-exploit-clop-ransomware.

14

77.    Any one of the following security measures, if employed by EY, could have stopped the Data Breach from occurring:

a) **Denying write access to all but local account used for writing to the web directory.** There is no reason to grant unauthenticated user access and all user access to a file or directory that does not need write access. Additionally, there are solutions with MOVEit and third-party solutions to provide an email or SMS notification in the event files are accessed, created, or modified.

b) **A firewall dropping all packets originating from IP addresses outside of the organization.** By dropping all packets from foreign IP addresses, this would have prevented Clop the ability to connect to perform the SQL injection.

c) **Placing the server in a DMZ.** This would have prevented Clop from delivering the TrueBot malware stopping the Data Breach. Publicly facing web servers can provide an attacker access inside the organization where they can traverse systems on the inside of any perimeter firewalls. A DMZ would help mitigate that vulnerability.

78.    Unfortunately for Plaintiff and the Class, EY failed to implement any of the above measures prior to the Data Breach, which was negligent.

79.    Additionally, BOA did not ensure EY employed adequate data security before giving EY access to Plaintiff's and the Class's PII. Had EY done so, it could have prevented the Breach by not utilizing EY's services to begin with.

80.    BOA also failed to monitor EY's data security during the relationship. Had it done so, BOA could have prevented the Breach.

**D.  *EY Failed to Comply with FTC Guidelines***

81.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security

practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

82.    In October 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

83.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers, have implemented reasonable security measures.

84.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable

and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

85.    As evidenced by the Data Breach, EY failed to properly implement basic data security practices. EY's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTCA.

86.    EY was at all times fully aware of its obligations to protect the Private Information of Plaintiff and Class Members yet failed to comply with such obligations. EY was also aware of the significant repercussions that would result from its failure to do so.

87.    Banks and other financial companies are routinely identified as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.[20]

88.    Some industry best practices that should be implemented by businesses like Defendants include but are not limited to educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, EY failed to follow some or all these industry best practices.

89.    Other best cybersecurity practices that are standard in the industry

---

[20]    *See*    https://www.cfo.com/news/financial-industry-is-third-most-targeted-by-hackers/654808/; https://www.comparitech.com/blog/vpn-privacy/financial-data-breaches/.

include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff and customers regarding these points. As evidenced by the Data Breach, EY failed to follow these cybersecurity best practices.

90.     EY failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

91.     EY failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**E.  *EY and BOA Breached their Duties to Safeguard Plaintiff's and Class Members' Private Information.***

92.     In addition to their obligations under federal and state laws, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, transferring, storing, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

93.     EY owed a duty to Plaintiff and Class Members to provide reasonable data security, including complying with industry standards and requirements, training for its staff,

and ensuring that its computer systems, software, networks, and protocols adequately protected the Private Information of Class Members.

94.    BOA owed a duty to Plaintiff and Class Members to ensure that any third party it hired who had access to Plaintiff's and the Class's PII complied with industry standards and requirements, trained its staff, and ensured that its computer systems, software, networks, and protocols adequately protected the Private Information of Class Members

95.    Defendants breached their duties and obligations owed to Plaintiff and Class Members and/or were otherwise negligent and reckless because they failed to properly safeguard Plaintiff's and the Class's PII. Defendants' unlawful conduct includes, but is not limited to, the following actions and/or omissions:

    a.  EY failing to maintain an adequate data security system that would reduce the risk of data breaches and cyberattacks;

    b.  Defendants failing to adequately protect customers' Private Information;

    c.  EY ailing to properly monitor its own data security systems for existing intrusions;

    d.  EY failing to properly oversee and monitor the MOVEit software;

    e.  EY failing to adequately secure the MOVEit software;

    f.  BOA failing to oversee and monitor EY;

    g.  BOA failing to ensure EY employed adequate data security before it provided EY with Plaintiff's and the Class's PII;

    h.  EY failing to sufficiently train its employees regarding the proper handling of files containing the Private Information;

i.   EY failing to fully comply with FTC guidelines for cybersecurity in violation of the FTCA;

j.   EY failing to adhere to industry standards for cybersecurity as discussed above; and

k.   otherwise breaching duties and obligations to protect Plaintiff's and Class Members' Private Information.

96.    EY negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing Clop to easily access its systems, and servers which contained unsecured and unencrypted Private Information.

97.    BOA negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Private Information by allowing a third-party with inadequate data security, EY, access to Plaintiff's and the Class's PII.

98.    Had EY remedied the deficiencies in its information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, it could have prevented intrusion into its information storage and security systems through the MOVEit software, and ultimately, the theft of Plaintiff's and Class Members' confidential Private Information.

99.    Had BOA ensured EY implemented adequate data security prior to giving EY access to Plaintiff's and the Class's PII it could have prevented the theft and disclosure of Plaintiff's and the Class's PII because it would have never been in EY's possession to begin with.

100.    Accordingly, Plaintiff's and Class Members' lives were severely disrupted.

What's more, they have been harmed as a result of the Data Breach and now face an increased risk of future harm that includes, but is not limited to, fraud and identity theft.

101. Plaintiff and Class Members also lost the benefit of the bargain they made with Defendants.

**F.  *Defendants Should Have Known that Cybercriminals Target PII to Carry Out Fraud and Identity Theft***

102. The FTC hosted a workshop to discuss "informational injuries," which are injuries that consumers like Plaintiff and Class Members suffer from privacy and security incidents such as data breaches or unauthorized disclosure of data.[21]

103. Exposure of highly sensitive personal information that a consumer wishes to keep private may cause harm to the consumer, such as the ability to obtain or keep employment.

104. Any victim of a data breach is exposed to serious ramifications regardless of the nature of the data that was breached. Indeed, the reason why criminals steal information is to monetize it. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims or to take over victims' identities in order to engage in illegal financial transactions under the victims' names.

105. Indeed, Clop has already posted data obtained in the Breach on the dark web

---

[21] *FTC Information Injury Workshop, BE and BCP Staff Perspective,* Federal Trade Commission, (October 2018), *available at* https://www.ftc.gov/system/files/documents/reports/ftc-informational-injury-workshop-be-bcp-staff- perspective/informational_injury_workshop_staff_report_-_oct_2018_0.pdf.

and clearweb.[22]

106.    Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

107.    In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

108.    Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Private Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

---

[22] https://cybernews.com/security/clop-victims-pwc-ernst-young-sony-moveit-hack/.

109.     For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a freeze on their credit, and correcting their credit reports.[23] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

110.     Identity thieves can also use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, rent a house in the victim's name, receive medical services in the victim's name, and even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.

111.     PII can be used to detect a specific individual. PII is a valuable property right. Its value is axiomatic, considering the value of big data in corporate America and the consequences of cyber thefts (which include heavy prison sentences). Even this obvious risk-

---

[23] *See* *IdentityTheft.gov,* Federal    Trade    Commission, *available* *at* https://www.identitytheft.gov/Steps.

to-reward analysis illustrates beyond doubt that PII has considerable market value.

112.    The U.S. Attorney General stated in 2020 that consumers' sensitive personal information commonly stolen in data breaches "has economic value."[24] The increase in cyberattacks, and attendant risk of future attacks, was widely known and completely foreseeable to the public and to anyone in Defendants' industry, including Defendants.

113.    The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, PII can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[25] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web and that the "*fullz*" (a term criminals who steal credit card information use to refer to a complete set of information on a fraud victim) sold for $30 in 2017.[26]

114.    Furthermore, even information such as names, email addresses and phone numbers, can have value to a hacker. Beyond things like spamming customers, or launching

---

[24] *See Attorney General William P. Barr Announces Indictment of Four Members of China's Military for Hacking into Equifax*, U.S. Dep't of Justice, Feb. 10, 2020, available at https://www.justice.gov/opa/speech/attorney-general-william-p-barr announces-indictment-fourmembers-china-s-military.

[25] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

[26] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the- dark-web/.

phishing attacks using their names and emails, hackers, *inter alia*, can combine this information with other hacked data to build a more complete picture of an individual. It is often this type of piecing together of a puzzle that allows hackers to successfully carry out phishing attacks or social engineering attacks. This is reflected in recent reports, which warn that "[e]mail addresses are extremely valuable to threat actors who use them as part of their threat campaigns to compromise accounts and send phishing emails."[27]

115.    The Dark Web Price Index of 2022, published by PrivacyAffairs[28] shows how valuable just email addresses alone can be, even when not associated with a financial account:

| Email Database Dumps | Avg. Price USD (2022) |
| --- | --- |
| 10,000,000 USA email addresses | $120 |
| 600,000 New Zealand email addresses | $110 |
| 2,400,000 million Canada email addresses | $100 |

116.    Beyond using email addresses for hacking, the sale of a batch of illegally obtained email addresses can lead to increased spam emails. If an email address is swamped with spam, that address may become cumbersome or impossible to use, making it less valuable to its owner.

117.    Likewise, the value of PII is increasingly evident in our digital economy. Many companies collect PII for purposes of data analytics and marketing. These companies, collect it to better target customers, and shares it with third parties for similar purposes.[29]

---

[27] *See* https://www.magicspam.com/blog/dark-web-price-index-the-cost-of-email-data/.

[28] *See* https://www.privacyaffairs.com/dark-web-price-index-2022/.

[29]         *See*              https://robinhood.com/us/en/support/articles/privacy-policy/.

118.    One author has noted: "Due, in part, to the use of PII in marketing decisions, commentators are conceptualizing PII as a commodity. Individual data points have concrete value, which can be traded on what is becoming a burgeoning market for PII."[30]

119.    Consumers also recognize the value of their personal information and offer it in exchange for goods and services. The value of PII can be derived not only by a price at which consumers or hackers actually seek to sell it, but rather by the economic benefit consumers derive from being able to use it and control the use of it.

120.    A consumer's ability to use their PII is encumbered when their identity or credit profile is infected by misuse or fraud. For example, a consumer with false or conflicting information on their credit report may be denied credit. Also, a consumer may be unable to open an electronic account where their email address is already associated with another user. In this sense, among others, the theft of PII in the Data Breach led to a diminution in value of the PII.

121.    Data breaches, like that at issue here, damage consumers by interfering with their fiscal autonomy. Any past and potential future misuse of Plaintiff's PII impairs their ability to participate in the economic marketplace.

122.    A study by the Identity Theft Resource Center[31] shows the multitude of harms

---

[30] *See* John T. Soma, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ('PII') Equals the "Value" of Financial Assets,* 15 Rich. J. L. & Tech. 11, 14 (2009).

[31] Steele, Jason, *Credit Card and ID Theft Statistics*, CreditCards.com (October 23, 2017), https://www.creditcards.com/credit-card-news/credit-card-security-id-theft-fraud-statistics-1276/ (image no longer available).

caused by fraudulent use of PII:



123.    It must also be noted that there ***may*** be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or personal financial information is stolen and when it is used. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:[32]

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

---

[32] *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO (June 2007), *available at* https://www.gao.gov/assets/270/262904.html.

124.    PII is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black market" for years.

125.    As a result, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future. Thus, Plaintiff and Class Members have no choice but to vigilantly monitor their accounts for many years to come.

**G.** ***Plaintiff's Experience***

126.    Plaintiff provided his PII, including his name, address, financial account information, debit and/or credit card numbers, social security number, to Bank of America prior to the Data Breach.

127.    Bank of America provided Plaintiff's PII to EY without ensuring EY employed adequate data security.

128.    On or around August 22, 2023, Plaintiff received a Notice Letter from EY notifying him that his PII was compromised in the Data Breach. [33]

129.    Plaintiff's PII was stolen in the Data Breach because BOA failed to ensure EY had adequate data security prior to granting EY access to Plaintiff's and the Class's PII and EY failed to secure MOVEit, allowing cybercriminals easy access to Plaintiff's and the Class's PII.

130.    As a direct and traceable result of the Data Breach, Plaintiff estimates he has spent ***at least 120 hours*** researching the Data Breach, reviewing and monitoring his accounts for fraudulent activity, and reviewing credit reports for fraudulent activity. Plaintiff also

---

[33] *See* Exhibit 1.

changes his online passwords every three days in an attempt to try to prevent fraud and identity theft. However, this is not the end. Plaintiff and the Class will now be forced to expend additional time to review their credit reports and monitor their accounts for the rest of their lives. This is time spent at Defendants' direction, which has been lost forever and cannot be recaptured.

131.    Plaintiff places significant value in the security of his PII and does not readily disclose it. Plaintiff entrusted his PII to BOA with the understanding that BOA would keep his information secure and would only provide his PII to third parties with adequate data security, not EY.

132.    As a direct and traceable result of the Data Breach, Plaintiff suffered actual damages such as: (i) theft of his PII; (ii) lost time related to monitoring his accounts for fraudulent activity; (iii) loss of privacy due to his PII being exfiltrated by cybercriminals and published on the dark web and clearweb; (iv) loss of the benefit of the bargain because Defendants did not adequately protect his PII; (v) severe emotional distress because identity thieves now possess his PII; (vi) exposure to an increased and imminent risk of fraud and identity theft now that his PII has been stolen; (vii) loss in value of his PII due to his PII being in the hands of cybercriminals who can use it at their leisure; and (viii) other economic and non-economic harm.

133.    As a direct and traceable result of the Data Breach, Plaintiff has been and will continue to be at a heightened and substantial risk of future identity theft and its attendant damages for *years* to come. Such a risk is certainly real and impending, and is not speculative, given the highly sensitive nature of the PII compromised by the Data Breach and the fact that

cybercriminals have admitted to stealing it and posting data obtained in the Breach on the dark web.

134. Defendants acknowledged the increased risk of future harm Plaintiff and the Class now face by offering complimentary credit monitoring services to Plaintiff and the Class. Such an offer was woefully inadequate as it will not prevent identity theft and fraud but will only alert Plaintiff once it has already occurred. The measly two (2) year offering of services completely ignores the fact that Plaintiff and the Class will be at a significant and imminent risk of future harm for the rest of their lives.

135. Knowing that thieves intentionally targeted and stole his PII, including his Social Security number and financial information, and knowing that Clop has already released data obtained in the Breach publicly, has caused Plaintiff great anxiety beyond mere worry. Specifically, Plaintiff has lost hours of sleep, is in a constant state of stress, is very frustrated, and is in a state of persistent worry now that his PII has been stolen as a result of the Data Breach.

136. Plaintiff has a continuing interest in ensuring that his PII which, upon information and belief, remains in the possession of Defendants, is protected, and safeguarded from future data breaches.

137. As a direct and traceable result of the Data Breach, Plaintiff will continue to be at heightened risk for financial fraud, identity theft, other forms of fraud, and the attendant damages, for years to come and will have to pay an identity monitoring company for the rest of his life to protect his PII.

**H. *Plaintiff's and Class Members' Damages***

138.    Plaintiff would not have provided his PII to BOA had BOA disclosed it would provide his PII to a third party with inadequate data security, such as EY.

139.    Additionally, Plaintiff would not have permitted his PII to be transmitted and/or stored via the MOVEit software had EY disclosed it took no measures to secure it.

140.    Plaintiff has suffered actual injury in the form of time spent dealing with the Data Breach and the increased risk of fraud resulting from the Data Breach.

141.    Plaintiff suffered actual injury in the form of having his Private Information stolen and published on the dark web as a result of the Data Breach.

142.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of his Private Information – a form of intangible property that Plaintiff entrusted to EY.

143.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft, and misuse posed by his Private Information being placed in the hands of criminals.

144.    Plaintiff and the Class have a continuing interest in ensuring that their Private Information, which remains in Defendants' possession and stored within MOVEit, is protected, and safeguarded from future breaches.

145.    Plaintiff also suffered actual injury as a result of the Data Breach in the form of (a) damage to and diminution in the value of his Private Information, a form of property that Defendants obtained from him; (b) violation of this privacy rights; and (c) present, imminent, and impending injury arising from the increased risk of identity theft, and fraud he

now faces.

146.    As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address the many harms caused by the Data Breach.

147.    In sum, Plaintiff and Class Members have been damaged by the compromise of their Private Information in the Data Breach.

148.    Plaintiff's Private Information was compromised as a direct and proximate result of the Data Breach, which Data Breach resulted from EY's failure to ensure it employed adequate data security with the use of the MOVEit software and BOA's failure to ensure EY employed adequate data security before granting EY access to Plaintiff's and the Class's PII.

149.    As a direct and proximate result of Defendants' actions and omissions, Plaintiff and Class Members have been harmed and are at an imminent, immediate, and continuing increased risk of harm, including but not limited to, having loans opened in their names, tax returns filed in their names, utility bills opened in their names, credit card accounts opened in their names, and other forms of fraud and identity theft.

150.    Plaintiff and Class Members also face a substantial risk of being targeted in future phishing, data intrusion, and other illegal schemes through the misuse of their Private Information, since potential fraudsters will likely use such Private Information to carry out such targeted schemes against Plaintiff and Class Members.

151.    The Private Information maintained by and stolen from Defendants, combined with publicly available information, allows nefarious actors to assemble a detailed mosaic of Plaintiff and Class Members, which can also be used to carry out targeted fraudulent schemes

against Plaintiff and Class Members.

152.    Additionally, as a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have also been forced to take the time and effort to mitigate the actual and potential impact of the Data Breach on their everyday lives, including placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, and/or closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

153.    Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

154.    Plaintiff and Class Members also suffered a loss of value of their Private Information when it was accessed, viewed, and acquired by Clop in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases. An active and robust legitimate marketplace for Private Information also exists.[34] In 2019, the data brokering industry was worth roughly $200 billion. In fact, the data marketplace is so sophisticated that consumers can sell their non-public information directly to a data broker who in turn aggregates the information and provides it to other companies.[35] Consumers who agree to provide their web browsing history to the Nielsen Corporation can in turn receive up

---

[34] *See* Data Coup, https://datacoup.com/.

[35] *What is digi.me?, DIGI.ME,* https://digi.me/what-is-digime/.

to $50 a year.[36]

155.    As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and illegal markets, has been harmed and diminished due to its acquisition by cybercriminals. This transfer of valuable information happened with no consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is apparently readily available to others, and the rarity of the Private Information has been destroyed because it is no longer only held by Plaintiff and the Class Members, and because that data no longer necessarily correlates only with activities undertaken by Plaintiff and the Class Members, thereby causing additional loss of value.

156.    Finally, Plaintiff and Class Members have suffered or will suffer actual injury as a direct and proximate result of the Data Breach in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach. These losses include, but are not limited to, the following:

    a.   Monitoring for and discovering fraudulent charges;

    b.   Canceling and reissuing credit and debit cards;

    c.   Addressing their inability to withdraw funds linked to compromised accounts;

    d.   Taking trips to banks and waiting in line to obtain funds held in limited accounts;

---

[36] *Frequently Asked Questions,* Nielsen Computer & Mobile Panel, https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

e.  Spending time on the phone with or at a financial institution to dispute fraudulent charges;

f.  Contacting financial institutions and closing or modifying financial accounts;

g.  Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

h.  Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

i.  Closely reviewing and monitoring bank accounts and credit reports for additional unauthorized activity for years to come.

157.    Moreover, Plaintiff and Class Members have a continuing interest in ensuring that their Private Information, which is believed to still be in the possession of Defendants, is protected from future additional breaches by the implementation of more adequate data security measures and safeguards, including but not limited to, ensuring that the storage of data or documents containing personal and financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted and protected within the MOVEit software.

158.    As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class Members have suffered a loss of privacy and have suffered cognizable harm, including an imminent and substantial future risk of harm, in the forms set forth above.

## V.    CLASS ACTION ALLEGATIONS

159.    Plaintiff brings this action individually and on behalf of all other persons similarly situated, pursuant to Federal Rule of Civil Procedure 23.

160.    Specifically, Plaintiff proposes the following Nationwide Class (referred to herein as the "Class" or "Class Members"), subject to amendment as appropriate:

> ### *Nationwide Class*
>
> All individuals who reside in the United States who received a Notice Letter from EY and/or BOA for the Data Breach that occurred on or around May 28, 2023 through May 31, 2023.

161.    Excluded from the Class are Defendants and their parents or subsidiaries, any entities in which they have a controlling interest, as well as their officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded is any Judge to whom this case is assigned as well as their judicial staff and immediate family members.

162.    Plaintiff reserves the right to modify or amend the definition of the proposed Nationwide Class, as well as add subclasses, before the Court determines whether certification is appropriate.

163.    The proposed Class meets the criteria for certification under Federal Rule of Civil Procedure 23.

164.    Numerosity. The Class Members are so numerous that joinder of all members is impracticable. Though the exact number and identities of Class Members are unknown at this time, based on information and belief, the Class consists of at least 30,000 individuals whose data was compromised in the Data Breach. The identities of Class

Members are ascertainable through Defendants' records.

165. <u>Commonality</u>. There are questions of law and fact common to the Class which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

    a.  Whether Defendants engaged in the conduct alleged herein;

    b.  When Defendants learned of the Data Breach;

    c.  Whether Defendants' response to the Data Breach was adequate;

    d.  Whether Defendants unlawfully lost or disclosed Plaintiff's and Class Members' Private Information;

    e.  Whether EY failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

    f.  Whether EY failed to employ appropriate data security measures within MOVEit;

    g.  Whether EY failed to oversee and monitor MOVEit;

    h.  Whether BOA failed to oversee and monitor EY;

    i.  Whether EY's data security practices related to MOVEit prior to and during the Data Breach complied with applicable data security laws and regulations;

    j.  Whether Defendants owed a duty to Class Members to safeguard their Private Information;

    k.  Whether Defendants breached their duties to Class Members to

safeguard their Private Information;

l. Whether Defendants had a legal duty to provide timely and accurate notice of the Data Breach to Plaintiff and the Class Members;

m. Whether Defendants breached their duty to provide timely and accurate notice of the Data Breach to Plaintiff and Class Members;

n. Whether EY knew or should have known that its data security systems and monitoring processes as it relates to MOVEit were deficient;

o. What damages Plaintiff and Class Members suffered as a result of Defendants' misconduct;

p. Whether Defendants' conduct was negligent;

q. Whether Defendants' conduct was *per se* negligent;

r. Whether Defendants' were unjustly enriched;

s. Whether Plaintiff and Class Members are entitled to actual and/or statutory damages;

t. Whether Plaintiff and Class Members are entitled to credit or identity monitoring and monetary relief; and

u. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

166. <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was compromised in the Data Breach.

167.    <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of Class Members. Plaintiff's counsel is competent and experienced in litigating class actions, including data privacy litigation of this kind.

168.    <u>Predominance</u>. EY has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer systems and unlawfully accessed and exfiltrated in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

169.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of this controversy and no unusual difficulties are likely to be encountered in the management of this class action. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct. In contrast, conducting this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

170.    Class certification is also appropriate. Defendants have acted and/or refused

to act on grounds generally applicable to the Class such that final injunctive relief and/or corresponding declaratory relief is appropriate as to the Class as a whole.

171.    Finally, all members of the proposed Class are readily ascertainable. Defendants have access to the names, addresses, and/or email addresses of Class Members affected by the Data Breach.

## VI.    CLAIMS FOR RELIEF

## COUNT I
## NEGLIGENCE
## (Alleged Against Both Defendants)

172.    Plaintiff restates and realleges the allegations stated above as if fully set forth herein.

173.    Defendants knowingly collected, acquired, and stored Plaintiff's and Class Members' Private Information, and had a duty to exercise reasonable care in safeguarding and protecting such Information from being disclosed, compromised, lost, stolen, and misused by unauthorized parties.

174.    To fulfill this duty of care, EY was required to ensure it maintained adequate data security, procedures, systems, infrastructure, and protocols and implemented such across its entire network environment.

175.    To fulfill this duty of care, BOA was required to ensure that any third party it allowed access to Plaintiff's and the Class's PII maintained adequate data security, procedures, systems, infrastructure, and protocols and implemented such across its entire network environment.

176.    EY was also required to oversee, monitor, and adequately protect all software

it utilized to store and transfer Plaintiff's and the Class's PII.

177.    EY's duty also included a responsibility to implement processes by which it could detect and analyze a vulnerability quickly and to give prompt notice to those affected in the case of a cyberattack.

178.    Defendants knew or should have known of the risks inherent in collecting the Private Information of Plaintiff and Class Members and the importance of adequate data security.

179.    Defendants were on notice because, on information and belief, they knew or should have known of the substantial increase in cyberattacks in recent years, including recent similar attacks against Accellion and Fortra carried out by the same Russian cyber gang, Clop.

180.    After all, Private Information is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, transferring, and storing the Private Information of Plaintiff and Class Members. Thus, Defendants knew, or should have known, the importance of exercising reasonable care in handling the Private Information entrusted to them.

181.    EY owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems, software, and networks, and the personnel responsible for them, adequately protected the Private Information in its possession.

182.    BOA owed a duty of care to ensure all third parties whom it gave access to Plaintiff's and the Class's PII provided data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems, software, and networks,

and the personnel responsible for them, adequately protected the Private Information it granted them access to.

183.    Defendants breached these duties, and thus were negligent, by failing to protect Class Members' Private Information. And but for Defendants' negligence, Plaintiff and Class Members would not have been injured. The specific negligent acts and omissions committed by Defendants include, but are not limited to:

a.    EY failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b.    BOA failing to ensure that all third parties it hired maintained adequate data security before granting them access to Plaintiff's and the Class's PII;

c.    EY failing to employ adequate security measures in its use of the MOVEit software;

d.    EY failing to comply with—and thus violating—FTC Act and its regulations;

e.    EY failing to adequately monitor the security of its networks, systems, and MOVEit software;

f.    EY failing to ensure that the MOVEit software had security in place to maintain reasonable data security safeguards;

g.    EY failing to have in place mitigation policies and procedures;

h.    Defendants allowing unauthorized access to Class Members' Private Information;

    i.    EY failing to detect in a timely manner that Class Members' Private Information had been compromised; and

    j.    Defendant failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

184.    Under the Federal Trade Commission Act, EY had a duty to employ reasonable security measures. Specifically, this statute prohibits "unfair . . . practices in or affecting commerce," including (as interpreted and enforced by the FTC) the unfair practice of failing to use reasonable measures to protect confidential data. Plaintiff and the Class are precisely the class of individuals the FTCA was designed to protect.

185.    Moreover, Plaintiff and Class Members' injuries are precisely the type of injuries that the FTCA guards against. After all, the FTC has pursued numerous enforcement actions against businesses that—because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices—caused the very same injuries that Defendants inflicted upon Plaintiff and Class Members.

186.    Defendants' duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendants are bound by industry standards to protect confidential Private Information.

187.    Defendants owed Plaintiff and members of the Class a duty to notify them within a reasonable time frame of any breach of their Private Information.

188.    Defendants also owed a duty to timely and accurately disclose to Plaintiff and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is

necessary for Plaintiff and Class Members to take appropriate measures to protect their Private Information, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the fallout of Defendants' Data Breach.

189.    Defendants owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendants knew or should have known would suffer injury-in-fact from its inadequate security protocols. After all, Defendants actively sought and obtained the Private Information of Plaintiff and Class Members.

190.    It was foreseeable that EY's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members.

191.    It was foreseeable that BOA's failure to ensure EY used reasonable measure to protect Plaintiff's and the Class Member's Private Information would result in injury to Class Members.

192.    Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the financial industry. It was therefore foreseeable that Defendants' failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

193.    Simply put, Defendants' negligence actually and proximately caused Plaintiff and Class Members' actual, tangible, injuries-in-fact and damages. These injuries include, but are not limited to, the theft of their Private Information by criminals, improper disclosure of their Private Information, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were

caused by Defendants' negligence. Moreover, injuries-in-fact and damages are ongoing, imminent, and immediate.

194.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

195.    Plaintiff and Class Members are also entitled to injunctive relief requiring: (1) EY to strengthen its data security systems and monitoring procedures regarding the MOVEit software; (2) Defendants to submit to future annual audits of those systems and monitoring procedures; and (3) Defendants to provide adequate credit monitoring to all Class Members.

## COUNT II
## BREACH OF IMPLIED CONTRACT
### (Alleged Against BOA)

196.    Plaintiff restates and realleges the allegations stated above as if fully set forth herein.

197.    Plaintiff and the Class Members entered into implied contracts with BOA under which BOA agreed to safeguard and protect their Private Information and to timely and accurately notify Plaintiff and Class Members that their information had been breached and compromised.

198.    Plaintiff and the Class were required to, and delivered, their Private Information to BOA as part of the process of obtaining financial services.

199.    Plaintiff and Class Members conferred a monetary benefit on BOA in that Plaintiff paid money to BOA in exchange for services. Part of this monetary benefit was to be used to provide a reasonable level of data security to protect Plaintiff's and the Class's Private Information.

200. BOA accepted possession of Plaintiff's and Class Members' Private Information for the purpose of providing services.

201. The implied promise of confidentiality includes consideration beyond those pre-existing general duties owed under state and federal regulations. The additional consideration included implied promises to take adequate steps to ensure the third parties it hired and gave access to Plaintiff's and the Class's PII complied with specific industry data security standards and FTC guidelines on data security.

202. The implied promises include but are not limited to: (1) taking steps to ensure that any agents who are granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the information that is placed in the control of its agents is restricted and limited to achieve an authorized purpose; (3) restricting access to qualified and trained agents; (4) designing and implementing appropriate retention policies to protect the information against criminal data breaches; (5) applying or requiring its third parties to employ proper encryption; (6) requiring its third parties to employ multifactor authentication for access; and (7) requiring its third parties to employ other steps to protect against foreseeable data breaches.

203. Based on the implicit understanding, Plaintiff and Class Members accepted BOA's offers for services and provided BOA with their Private Information.

204. Plaintiff and Class Members would not have permitted their Private Information to be collected and stored by BOA had they known that BOA would not safeguard their Private Information, as promised, or provide timely notice of a data breach.

205.    Moreover Plaintiff and Class Members would not have provided their PII to BOA had they known BOA would provide it to a third-party, such as EY, with inadequate data security.

206.    Plaintiff and Class Members fully performed their obligations under their implied contracts with BOA.

207.    BOA breached the implied contracts by failing to safeguard Plaintiff's and Class Members' Private Information and by failing to provide them with timely and accurate notice of the Data Breach.

208.    The losses and damages Plaintiff and Class Members sustained (as described above) were the direct and proximate result of BOA's breach of its implied contracts with Plaintiff and Class members.

**COUNT III**
**UNJUST ENRICHMENT**
**(Alleged Against BOA)**

209.    Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

210.    This Count is pleaded in the alternative to Count II.

211.    Plaintiff and Class Members conferred a benefit on BOA by surrendering their Private Information to BOA.

212.    BOA derived profits from Plaintiff's and the Class's PII because it allowed BOA to provide services and derive revenue therefrom.

213.    As such, a portion of the payments made to BOA, which payments would not be possible without Plaintiff and Class Members turning over their Private Information, was

to be used to utilize third parties with reasonable and adequate data security that followed applicable state and federal regulations and industry standards. However, BOA did not do this. Rather, BOA carelessly employed a third-party with inadequate data security and retained the benefits of its unlawful conduct, including the amounts of payment received that should have been used for a third party with adequate cybersecurity practices.

214.    BOA knew that Plaintiff and Class Members conferred a benefit upon it, which BOA accepted. BOA profited from these transactions and used the Private Information of Plaintiff and Class Members for business purposes, while failing to use the payments it received for a third party that had adequate data security measures, which would have secured Plaintiff's and Class Members' Private Information and prevented the Data Breach.

215.    If Plaintiff and Class Members had known that BOA would not employ third parties with adequate data security they would not have agreed to provide such Private Information to BOA to begin with.

216.    Due to BOA's conduct alleged herein, it would be unjust and inequitable under the circumstances for BOA to be permitted to retain the benefits of its wrongful conduct.

217.    As a direct and proximate result of BOA's conduct, Plaintiff and Class Members have suffered and/or are at a substantial and continuous risk of suffering injury, including but not limited to: (i) actual identity theft; (ii) the loss of the opportunity to control how their Private Information is used; (iii) the compromise, publication, and theft of their Private Information; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their Private Information; (v) lost opportunity costs associated with effort expended and the loss of productivity addressing

and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (vi) the continued risk to their Private Information, which remains in defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the Private Information in their continued possession; and (vii) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the Private Information compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

218.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendants and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendants from their wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

219.    Plaintiff and Class Members may not have an adequate remedy at law against Defendants, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

## COUNT IV
## INVASION OF PRIVACY
## (Alleged Against Both Defendants)

220.    Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

221.    Plaintiff and the Class had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

222.    Defendants owed a duty to Plaintiffs and the Class, to keep their Private Information confidential.

223.    Defendants failed to protect and thereby allowed unknown and unauthorized third parties access to the Private Information of Plaintiff and the Class.

224.    Defendants allowed unauthorized and unknown third parties access to and examination of the Private Information of Plaintiff and the Class, by way of Defendant's failure to protect the Private Information.

225.    The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiff and the Class is highly offensive to a reasonable person.

226.    The intrusion was into a place or thing, which was private and is entitled to be private.

227.    Plaintiff and the Class disclosed their Private Information to BOA as part of their special relationship with Defendant, but privately with an intention that the Private Information would be kept confidential and would be protected from unauthorized disclosure. Plaintiff and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

228.    The Data Breach, at the hands of Defendants, constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their

persons or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

229.    BOA acted with a knowing state of mind when it permitted the Data Breach to occur because it was with actual knowledge that EY's information security practices were inadequate and insufficient.

230.    EY acted with a knowing state of mind when it permitted the Data Breach to occur because it was with actual knowledge that its information security practices were inadequate and insufficient.

231.    Because Defendants acted with this knowing state of mind, they had notice and knew the inadequate and insufficient information security practices would cause injury and harm to Plaintiffs and the Class.

232.    As a proximate result of the above acts and omissions of Defendants, the Private Information of Plaintiffs and the Class was disclosed to third parties without authorization, causing Plaintiff and the Class to suffer damages.

233.    Unless and until enjoined, and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class in that the Private Information maintained by Defendants can be viewed, distributed, and used by unauthorized persons for years to come.

234.    Plaintiffs and the Class have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and the Class.

## COUNT V
## DECLARATORY AND INJUNCTIVE RELIEF
### (Alleged Against EY)

235.    Plaintiff incorporates by reference all preceding factual allegations as though fully alleged here.

236.    This count is brought under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

237.    As previously alleged and pleaded, EY owe duties of care to Plaintiffs and Class Members that requires EY to adequately protect and secure their PII.

238.    EY still possesses the PII of Plaintiffs and Class Members.

239.    EY has not satisfied its contractual obligations and/or legal duties to Plaintiffs and the Class Members.

240.    EY has not claimed it is taking steps to increase its data security procedures and protocols, and even if it were there is nothing to prevent EY from reversing these changes once it has weathered the increased public attention resulting from this Breach, and to place profits above protection.

241.    Plaintiffs, therefore, seek a declaration (1) that EY's existing security measures do not comply with its duty of care to provide adequate security, and (2) that to comply with its duties of care, EY must implement and maintain reasonable security measures, including, but not limited to:

a)      Ordering EY to engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on EY's systems on a periodic basis, and ordering EY to promptly correct

any problems or issues detected by such third-party security auditors;

b)      Ordering EY to significantly increase its spending on cybersecurity including systems and personnel;

c)      Ordering EY to secure the MOVEit software;

d)      Ordering EY to engage third-party security auditors and internal personnel to run automated security monitoring;

e)      Ordering that EY audit, test, and train their security personnel regarding any new or modified procedures;

f)      Ordering that EY segment Plaintiff's and the Class's PII by, among other things, creating firewalls and access controls so that if one area of EY's systems is compromised, hackers cannot gain access to other portions of EY's systems;

g)      Ordering that EY cease transmitting PII via MOVEit until it is adequately secured;

h)      Ordering that EY cease storing PII in MOVEit until it is properly secured;

i)      Ordering that EY conduct regular database scanning and securing checks;

j)      Ordering EY to routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

k)      Ordering EY to implement and enforce adequate retention policies for PII, including destroying, in a reasonably secure manner, PII once it is no longer necessary for the it to be retained; and

l)      Ordering EY to meaningfully educate its current, former, and prospective

employees and subcontractors about the threats they face as a result of the loss of their financial and personal information to third parties, as well as the steps they must take to protect themselves.

## VII.    <u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff, on behalf of himself and the Class described above, seeks the following relief:

a. An order certifying this action as a Class action under Federal Rule of Civil Procedure 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiff is a proper representative of the Nationwide Class requested herein;

b. Judgment in favor of Plaintiff and Class Members awarding them appropriate monetary relief, including actual damages, statutory damages, equitable relief, restitution, disgorgement, and statutory costs;

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class as requested herein;

d. An order instructing Defendants to purchase or provide funds for lifetime credit monitoring and identity theft insurance to Plaintiff and Class Members;

e. An order requiring Defendants to pay the costs involved in notifying Class Members about the judgment and administering the claims

process;

f.   A judgment in favor of Plaintiff and Class Members awarding them prejudgment and post-judgment interest, reasonable attorneys' fees, costs, and expenses as allowable by law; and

g.   An award of such other and further relief as this Court may deem just and proper.

### VIII.    <u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff demands a trial by jury on all triable issues.

DATED:  September 26, 2023

*/s/: William B. Federman*

William B. Federman (WF9124)

**FEDERMAN & SHERWOOD**

10205 N. Pennsylvania Ave.

Oklahoma City, OK  73120

Telephone: (405) 235-1560

Facsimile: (405) 239-2112

wbf@federmanlaw.com
